[PHILADELPHIA, APRIL 3d, 1837.]

## KRAUSE'S APPEAL.

A lease of lands to A., his executors and administrators, for the term of twelve months, and so from year to year as long as both parties please, with a covenant not to assign without the special license under seal of the lessor, and a proviso, that if the lessor should determine the lease, the lessee should be reimbursed all reasonable expenses in building, fencing, and improvement upon the premises, the value of the improvements to be ascertained in a certain way ; does not vest any title to the freehold in the lessee, so as to subject his interest to the lien of a judgment.

THIS was an appeal from a decree of the Court of Common Pleas of Northampton County, in the matter of the accounts of the assignees of William Smick.

The facts upon which the controversy arose, were as follows :—

On the 30th of April, 1803, Christian Benzien, (the secular head of the Moravian Society,) by his attorney, Jacob Van Vleck, executed an indenture of lease to John Jacob Smick, (father of William Smick,) of a certain messuage and lot of ground, situate in the town of Nazareth, in the county of Northampton, being the lot marked No. 27 in the plan of the said town, &c. " To have and to hold the demised premises unto the said John Jacob Smick, his *executors and administrators*, for and during, and until the *full end and term of twelve months*, from the day of the date thereof, from thence next ensuing, *and so from year to year as long as both the said parties shall please :* Yielding and paying unto the said Benzien, or to his attorney, heirs or assigns, the yearly rent of 16 shillings and 6 pence currency, or two dollars and twenty eight cents, United States money." This lease contained the following covenants :

1. That the lessee, his executors or administrators, should not nor would let, set, bargain, sell or assign, the said leased premises, or any part thereof, without the *special* license and consent of the lessor, his attorney, heirs or assigns, first had and obtained, under his or their hands and seals.  2. That if the said lessee, his executors or administrators, should without such special license or consent, let, bargain, sell or assign, the said leased premises, then and in such case the said lease, and every covenant therein contained on the lessor's part, to become absolutely void and of none effect; and then it should be lawful for the lessor, his attorney, heirs or assigns, into and upon the premises, and all and singular the buildings and improvements thereon, with the appurtenances, wholly to re-enter, and the same to have again, repossess and enjoy, as of his former

estate, and to oust and evict the lessee, his assignee or assigns. Provided that upon the re-entry of the lessor, his attorney, heirs or assigns, or when he or they should think fit to determine the lease, then, and in either of the said cases, the lessee, his executors or administrators, should be reimbursed and repaid all his and their reasonable expenses and disbursements in building, fencing and improvement in and upon the said premises, that is to say, one-third part thereof from and immediately after the expiration or sooner determination of the lease, and the residue in three equal yearly payments, to commence and be reckoned from the day of the determination aforesaid. 3. In case of any controversy respecting the value of the improvements, the same should be referred to three judicious and indifferent men of the neighbourhood and town of Nazareth, whereof each party should choose one, and the two persons so chosen should choose a third; and the award of the three persons so chosen, or a majority of them, should be conclusive and binding on all the persons and parties concerned, so as such award should be in writing, under the hands and seals of the referees or a majority of them, and ready to be delivered to the parties within the space of ten days next after the delivery of the account of disbursements, and so as the sum to be reimbursed should not exceed the sum of £185.

On the 4th of October, 1804, John Jacob Smick died without having paid for the buildings which were erected on the premises at the time he came in possession, for which he was to pay £220. His widow retained the possession of the premises, and assumed the payment of the said £220, by the consent and permission of the society; and by the year 1808, she had paid the said sum of £220 to the society. No lease or leases were ever entered into between the said widow, Joanna Smick, and the society, or its agent. Previously to the death of the said Joanna, which took place in 1832, William Smick, her son, erected by her permission, a shop, a barn, and sundry outhouses upon the premises.

On the 5th of August, 1831, judgment was entered in the Court of Common Pleas of Northampton County, by John Krause v. William Smick, on a bond dated 30th of May, 1831, in the penalty of $1600, conditioned for the payment of $800 on the 30th of May, 1832, with interest.

On the 10th of January, 1833, William Smick executed a mortgage to John S. Haman, of " all that messuage, tenement and lot of ground, situated in the town of Nazareth, aforesaid; containing in front on the public road, seventy feet, and in depth one hundred and eighty feet; bounded by the Nazareth tavern, lands of Joseph Sweishoupt and others, and designated No. 27, in the plan of said town." This mortgage was given to secure the payment of $1089 82, with interest from the date, and was recorded on the same day.

On the 4th of February, 1833, William Smick executed an as-

signment to John G. Kummer, John S. Haman and C. D. Busse, in trust for the benefit of his creditors, transferring to said trustees the premises above mentioned, his stock in trade, tools, household furniture, notes, bonds, debts, goods and effects, and all other his property, real, personal or mixed, in trust to sell the property assigned with all convenient speed, and with the proceeds of such assigned property, to pay and discharge all liens upon the said property, according to their legal priority, and to divide and apportion the balance among all his other creditors, &c. The assignees gave the requisite security; and the assignment was duly recorded on the 4th of March following.

On the 9th of February, 1833, an execution was issued on the judgment of Krause *v.* Smick, which was levied upon the messuage and lot of ground described in the lease to John Jacob Smick, and in the mortgage by William Smick to Haman.

Joanna Smick left three children, who made a division of her property among themselves, after her death. The house and other buildings were taken by William Smick at a valuation, who executed the mortgage to Haman, (a son-in-law of Joanna Smick,) to secure payment of his proportion of the valuation, in right of his wife, and also of a debt due to him personally.

On the 26th of August, 1834, the assignees of William Smick presented their accounts, which were referred to an auditor, who reported that there was a balance in their hands for distribution of $2883 44.

John Krause excepted to the report, on the ground that a preference was not given to his judgment over the other debts of Smick.

After argument, the Court ordered that the amount due upon the mortgage be paid to the mortgagee, and that the balance be distributed *pro rata.* The opinion of the Court upon this question, which was delivered by BANKS, President, was to the following effect.

" The confirmation of this report was objected to, because the judgment of John Krause was not given a preference over the other debts of the said William Smick. It has been contended that this judgment was a lien on the piece of land mentioned in the report. It has been argued as if William Smick, at the time the judgment was entered, had all the right that was granted to Jacob Smick, by virtue of the indenture of the 30th of April, 1803. The report does not show this to be exactly the fact. Inasmuch, however, as the counsel have so considered it, the court will assume the fact to be so. The question is, what interest was granted by said indenture— was it merely a leasehold estate, or was it more ? By the terms of the indenture, Smick was to hold the premises for one year for a certain rent, and so on from year to year, as long as both parties

should please. The tenant covenanted that he would not sell his lease without the consent of his landlord first obtained. The landlord reserved the right to enter at any time and determine the estate. The tenant might at any time quit the premises without any breach of covenant. If the landlord did enter and determine the estate, the improvements made upon the land were to be appraised and paid for by the landlord. These are the prominent provisions of the indenture. Was this more than a leasehold estate? It is well settled in Pennsylvania, that a judgment is a lien on every kind of equitable interest in land. It binds every kind of right to the land, whether legal or equitable, which is vested in the debtor at the time of the judgment. The right must be to the land as a vested interest in it, such as a pre-emption to it, as in the case of *Carkhuff* v. *Anderson*, (5 *Binney.* 4,) or an equity, by contract, such as in the case of *Ely* v. *Beaumont*, (5 *Serg. & Rawle*, 127.) Upon a critical examination of all the cases in Pennsylvania, it will be found that all inceptive titles in land, accompanied with an estate, property or real interest in the land itself, whether it be legal or equitable, have been considered as subject to the lien of a judgment. This we take to be the rule which has been long and well settled. By this indenture Smick had no interest in the land. His estate was but leasehold, and could in no event, by its terms, become a fee. Therefore the judgment was not a lien upon it, nor did the said judgment-creditor gain any preference by virtue of his levy on the land, under the circumstances of the case."

John Krause appealed from the decree of the Common Pleas to this Court, and assigned the following reasons:

" 1. That the court erred in treating the Moravian estates as mere leasehold interests, and not subject to the lien of a judgment.

2. In not decreeing to John Krause the amount of his judgment, in preference to other creditors.

3. In awarding to John S. Haman a preference for his mortgage debt."

Mr. *Porter*, for the plaintiff in error.

The estate in question was part of the town of Nazareth. The title of the *Unitas Fratrum*, usually called the Moravian society, is vested in the secular head of their society for the time being, and has been so from their first purchases in America. There is no written trust declared by him, but it is well understood that he holds the legal estate for the benefit of the society, and lets or disposes of the estate, or such portions of it, as are needed by the members, agreeably to the rules of the society, in such manner as to give the members the full benefit of the property, subject to the control of the society, so that no improper persons may come to reside among them. In many instances the estates have gone from father to son,

(Krause's Appeal.)

to the third generation, which were originally granted on leases precisely like the one in question, and without any written renewal of the same; and buildings to the value of many thousand dollars have been erected on them. These facts, part of the history of the society, and familiar to the residents of the county where their principal establishment in America is, were treated as part of the case, and commented upon and used in the Common Pleas on the argument of the question there.

This was such an interest in land as was bound by the judgment, within the principle of *Carkhuff* v. *Anderson* and *Ely* v. *Beaumont.* The lessee acquired a title by his improvements, which could not be devested. *Vandevender's case,* (2 *Browne,* 304); *Jackson* v. *Tuttle,* (9 *Cowan,* 233); *Morrow* v. *Brenizer,* (2 *Rawle,* 188); *Fleetwood's case,* (8 *Coke,* 171.)

Mr. *Ihrie, contra,* was stopped.

The opinion of the court was delivered by

Huston, J.—The question presented in this case is, was the interest of William Smick in certain houses and a lot, leasehold or freehold? or in other words, was it bound by a judgment? For there is no question, that, whether his interest was for years or for life, or in fee, or whether legal or equitable, it was transferable. That is admitted. The appellant says it was bound by the judgment in favour of J. Krause; if it was a freehold, whether legal or equitable, this would have been the case.

Neither the act of parliament, which, in England, subjected lands, *sub modo,* to the payment of debts; nor our act of 1700 or 1705, which made them liable to be sold absolutely for payment of debts, expressly provided that a judgment should be a lien on lands. In both countries, however, it was held to bind the lands. Many and different reasons have been given for this. But as both there and here it is expressly assumed by the legislatures of the different countries; and the time when the lien is to commence, and how long it shall continue, without any act of the plaintiff, and by what proceeding its lien may be prolonged, is expressly provided by different laws, familiar to every lawyer, and even to every man of business. We may content ourselves with saying, that a judgment is a lien in Pennsylvania on real estate, by act of assembly; and the nature and extent of the lien is according to the provisions of these enactments.

In England, however, in the courts of law, only the legal estate in lands can be reached; if the right or interest of the debtor is equitable only, his interest can be reached in chancery, or some court having jurisdiction in the chancery forms. Here such rights could not have been reached by a creditor, unless our courts had applied the forms of the common law to every estate, whether

legal or equitable. Our earliest reported decisions recognise this; and from our earliest cases, contingent estates, estates or interests of *cestui que trust,* &c. have been levied on and sold on *fi. fa.* and *venditioni exponas,* (4 *Yeates,* 427); and the lien of a judgment binds all equitable interests in land, and every interest vested in the debtor at the time of the judgment, and the sheriff sells, and the purchaser gets his right, whatever it may be. *Carkhuff* v. *Anderson,* (3 *Binn.* 5); and see the cases cited, (1 *Whar. Digest,* 458, title Lien of a Judgment.) This case was cited to show that a judgment is a lien on all interests in lands. I need not repeat what has been often said, that the expressions of a judge are to be applied to the subject-matter before him; and if correct and true as applied to that case, it is all that can be expected or desired. No man can, in every opinion, state all the exceptions, nor need he attempt it. In that case the title levied on and sold, was a claim under the state of Connecticut, which, by an act of assembly for compromising and settling those claims, might be made good, on complying with certain terms prescribed in that law: by former laws, the assertion of claim from Connecticut, under certain circumstances, had been a crime, and punishable by indictment, after the compromising act. The court considered, as the act considered, the title under Connecticut as one which could be made good; as giving the holder an equitable right to the land, on fulfilling the terms of the act; and the question, often decided, and even considered settled before, viz. whether an equitable interest in lands could be levied on and sold for debt, was again brought into discussion. All these Connecticut claimants asserted a right to the fee simple. Their estate was a fee, or was nothing. The law gave them the power of obtaining a title from this state. The case of a tenant for years, and how a judgment affected his interest, or whether it affected it at all, until execution was put into the hands of the sheriff, was not before the court, nor in the mind of the court; and it is not a small mistake to attempt to apply what is said there, as having any application to an estate of a lessee for years.

It was settled in *Fleetwood's case,* (8 *Co.* 171,) that a judgment did not bind the right of a tenant for years; but that after a judgment against a tenant for years, he might sell his interest, and the purchaser hold it, clear of the judgment; or rather, that was recognised as the long settled law; and where the interest of the tenant is only for years, I am not aware that this has, before this case, been disputed. The case of *Eli* v. *Beaumont,* (5 *Serg. & Rawle,* 124,) has been cited. There the landlord gave a lease of a lot for forty-nine years, and it was agreed that the tenant should build on the lot, and at the end of the forty-nine years, the landlord should pay for the improvements; or, if he did not do so, he should convey the lot in fee to the tenant, at a price to be fixed by referees. The tenant erected buildings worth $2000; and it was held, that having

(Krause's Appeal.)

done so, he could, on the landlord refusing to pay for the improvements, compel a conveyance in fee for the lot, on paying or tendering the price fixed. In other words, that the tenant was, on a contingency, which had happened, considered a purchaser by articles of agreement, depending on a contingency, to be sure, but his interest was not that of a bare tenant for years, but entitled him, in certain events, to become owner of the fee.

Let it be observed, that the case did not turn on the clause by which the landlord was to pay for the improvements, but is fixed expressly on the latter clause, under which the tenant might become owner in fee simple.

In the present case the lease is explicit. It is for the term of twelve months from the date, and so from year to year as long as both parties shall please; and after a covenant that the lessee should not assign, and that if he did, the lease should expire, and the lessor have a right to re-enter; it provides, that on the determination of the lease, by assignment, or otherwise by the will of either party, the tenant, or his heirs or executors, should be reimbursed and repaid all his or their reasonable expenses, in building, fencing and improvements; one third-part immediately, and the remainder in three yearly payments; not a word about any right of the tenant to purchase; on the contrary, the terms of the lease, and the admitted meaning and intention of the parties was that he never should become the owner of the fee. The *Unitas Fratrum*, commonly called the Moravian society, intended to keep the title and the right of possession in themselves. This lease only gave an estate for years; the judgment did not bind it. The decision is right.

Judgment affirmed.